**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HEATHER DANIELS** and | ) | |
| **URBAN BRATZ, LLC**, | ) | |
| | ) | Case No. 10 C 5345 |
| Plaintiffs, | ) | |
| | ) | Judge Robert W. Gettleman |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **SPENCER GIFTS, LLC**, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Heather Daniels and Urban Bratz, LLC ("Plaintiffs") have brought this action against Defendants Spencer Gifts, LLC ("Spencer Gifts"), Spencer Gifts Holding, LLC, and Spencer Gifts Online, LLC ("Defendants") for violations of the Copyright Act, 17 U.S.C. § 101 *et seq.*, the Lanham Act, 15 U.S.C. § 1125(a), and various state laws. Plaintiffs design and sell children's apparel with original graphic designs. Defendants operate a nationwide chain of gift stores. According to Plaintiffs, Heather Daniels created and copyrighted an original design for a T-shirt titled "Sorry Boys, My Daddy Says I Can't Date 'Till I'm 30" and submitted it to Defendants for consideration as an item to be sold in stores. Plaintiffs allege that Defendants misappropriated this copyrighted design and began selling identical shirts in Spencer Gifts stores and on the company's website.

Shortly after this suit was filed, Plaintiffs served discovery requests on Defendants on or around August 26, 2010. On September 23, 2010, Plaintiffs filed a motion for sanctions based

on Defendants' alleged failure to answer these requests properly. District Judge Robert Gettleman referred the motion to this Court for a decision pursuant to N.D. Ill. Rule 72.1. Plaintiffs later withdrew that motion, filed two new sanctions motions, two supplemental sanctions motions, and a motion to compel. As the supplemental motions incorporated Plaintiffs' earlier motions, the Court denied the initial motions without prejudice. Before the Court now are Plaintiffs' two supplemental motions for sanctions and the motion to compel. After multiple hearings and two forensic examinations, the Court finds that Plaintiffs' motions should be denied.

## I. <u>Procedural Background</u>

This dispute centers around Plaintiffs' belief that Defendants have failed to produce discovery responses that adequately account for the number of "Sorry Boys" shirts Spencer Gifts ordered (or cancelled), paid for, and sold. The details of this dispute are complex and have been exhaustively briefed by the parties. In its simplest terms, Plaintiffs believe that Defendants ordered up to 95,500 shirts and have not properly accounted for approximately 70,000 of those orders. The parties agree that Spencer Gifts purchased the "Sorry Boys" shirts through its vendor, Tee Shirt Central, and not from Plaintiffs directly. Spencer Gifts did so electronically by using a third party, known as SPS Commerce ("SPS"), which provides business-to-business integration for ordering and shipping commerce through a computer-based system that exchanges business information between companies in a standard format. SPS then sent the order information it received to Tee Shirt Central. In turn, Tee Shirt Central shipped the shirts directly to Spencer Gifts. Defendants gave the merchandise SKU (Stock Keeping Unit)

numbers, seven of which were assigned to the various kinds of "Sorry Boys" shirts purchased

from Tee Shirt Central.

On August 26, 2010, Plaintiffs filed a motion for expedited discovery and attached their

discovery requests to it.  District Judge Gettleman granted Plaintiffs' motion and ordered

Defendants to respond to the discovery requests by September 20, 2010.  (Dckt. 8).  The

Defendants did so in a timely manner.  On September 23, however, Plaintiffs filed their first

motion for sanctions, claiming that Defendants had violated Judge Gettleman's discovery order

by refusing to hand over all the documents Plaintiffs sought. (Dckt 22).  Judge Gettleman

referred the motion to this Court.[1]  Several months later, Plaintiffs filed two motions for

sanctions and then a supplemental motion that incorporated the earlier filings.  (Dckt. 77).  The

---

[1]  The motion claimed that Judge Gettleman's September 1, 2010 discovery order
overruled Defendants' discovery objections, even though Defendants had not asserted their
specific objections at that point. (Dckt. 22 at ¶ 25).  The Court notes this fact because Plaintiffs
have raised similar issues concerning their discovery requests and Judge Gettleman's order that
have given the Court some pause.  For example, Plaintiffs claimed at the January 25, 2012
hearing that in granting the expedited discovery motion, Judge Gettleman ordered Defendants to
produce specific items such as forensic computer data on a "bit-by-bit" basis, as sought in a
number of requests for production.  In their motion to compel discussed below, Plaintiffs also
claim that their August 26, 2010 motion for expedited discovery sought "to compel Spencer to
produce documents[.]" (Dckt. 140 at 1- 2).

Examination of Judge Gettleman's order and the transcript of the hearing on which it was
based shows that this account is not accurate.  Plaintiffs state that Defendants answered their
discovery requests on September 27, 2010. (Dckt. 140 at 2).  However, Defendants responded on
September 20, as Judge Gettleman ordered.  Moreover, Plaintiffs' expedited discovery motion
did not seek to "compel" answers from Defendants, at least in the ordinary meaning of that term.
It is difficult to understand how they could have done so, as the discovery requests were
apparently first delivered to Defendants on the same day as the expedited discovery motion was
submitted, and only two days after the case was itself filed.  Contrary to the implication of
Plaintiffs' representation to this Court, Judge Gettleman did not address any of the specific items
included in Plaintiffs' discovery requests; he only ordered that discovery should be expedited and
that both parties should preserve relevant evidence. (Dckt. 8 and Dckt. 151 at Ex. H).

supplemental motion alleged, *inter alia*, that Defendants misstated the number of shirts sold, falsely represented that Spencer Gifts did not keep records on a store-by-store basis, and intentionally scrambled produced data. Functioning as much as a motion to compel as one for sanctions, Plaintiffs asked the Court to order Defendants to produce all of its computer records on a bit-by-bit basis and turn over all records of internet sales. In the alternative, Plaintiffs sought the harsh sanction of default judgment.

At the hearing on Plaintiffs' motion, it became clear that a number of issues concerning what Defendants had actually produced and how that production should be interpreted could not be decided based on the parties' briefs. For instance, Defendants admitted to certain errors in its original production, though some of the initial mistakes had already been corrected. Central to the parties' dispute was Plaintiffs' allegation that Spencer Gifts ordered 95,500 shirts. Defendants contended that Spencer Gifts received fewer than 25,000 shirts. Accordingly, the Court ordered Defendants to provide an affidavit clarifying various fact issues related to these claims.

On May 12, 2011, the Chief Financial Officer for SPS, Kim Nelson, signed an affidavit stating that the seven "Sorry Boys" SKUs showed that Spencer Gifts issued purchase orders in a total amount of 24,865 shirts. She also testified that Tee Shirt Central invoiced Spencer Gifts for a total of 24,874 shirts. (Dckt. 130 at Ex. D). Plaintiffs filed further objections, and the Court held a hearing on May 23, 2011. The parties again disputed the underlying fact issues of how many "Sorry Boys" shirts had been ordered, cancelled, or sold. The Court made clear that such factual disputes were not within the scope of the issues referred by Judge Gettleman and were matters that went to the merits of Plaintiffs' underlying claims at trial. Instead, the only relevant

issues were whether Defendants had adequately responded to Plaintiffs' discovery requests and whether sanctions were warranted.

Based on the parties' differences on the reliability and interpretation of Defendants' production, the Court ordered that a forensic exam of the SKUs at issue should take place at Defendants' place of business. All seven of the "Sorry Boys" SKUs were included, and access was granted to Defendants' database and other sources for additional financial information. Plaintiffs were allowed to chose their own forensic expert, to copy the database in native format, and to be accompanied by their counsel at the exam. (Dckt. 137).

Unfortunately, the subsequent forensic exam did not end the dispute between the parties. Plaintiffs filed a status report on the forensic exam, claiming that their expert, Joseph Caruso, had been prevented by Defendants from conducting the exam himself and was required to relay his requests through an employee of the Defendants. (Dckt. 142 at 7). On July 26, 2011, Plaintiffs also filed a motion to compel the production of certain emails they claimed Defendants had failed to turn over as part of Plaintiffs' August 2010 discovery requests. (Dckt. 140).

In order to achieve some resolution of the parties' ongoing disagreement, the Court ordered the parties to work out a joint electronic query concerning all the issues Plaintiffs wished to explore in a second forensic exam. The Court laid particular stress on the need for cooperation between the parties. A letter by Defendants' counsel dated August 8, 2011 reflects what appears to be the terms agreed to during a recess at the August 1 hearing. (Dckt. 198 at Ex. 4). These included, among other things, inquiries concerning Spencer Gifts' proprietary merchandise and inventory system, Spencer's Integrated Retail Information System ("SIRIS"), and its use of the PeopleSoft financial accounting package, which records Spencer Gifts'

accounts payable and receivable. (*Id.*). Plaintiffs requested minor changes to the queries. (Dckt. 201 at Ex. G). The exam went forward, and Defendants produced the results on or around August 17, 2011. As before, however, further controversy resulted from this effort, and Plaintiffs filed a second supplemental motion for sanctions on September 21, 2011. Plaintiffs claimed that Defendants failed to produce forensics after August 2010, attempted to conceal SKU 0220588, and tried to hide a variety of other data allegedly responsive to Plaintiffs' requests. (Dckt. 156).

## II.  Discussion

The two sanctions motions currently pending seek the harsh sanction of default judgment based on allegations that the Defendants deliberately concealed evidence, altered information, and acted to obstruct the discovery process. Like the initial motion for sanctions (Dckt. 22), however, they also seek to compel discovery and are essentially hybrid documents that are both motions to compel and motions for sanctions. In fact, the great majority of this Court's efforts has been directed towards clarifying what Plaintiffs are requesting, what Defendants have produced, and whether any relevant information exists that has not been turned over to Plaintiffs. The Court decides these issues by first turning to Plaintiffs' motion to compel and then taking up the motions for sanctions.

### A.     The Motion to Compel

A party may file a motion to compel under Fed. R. Civ. P. 37 whenever another party fails to respond to a discovery request or when its response is insufficient. Fed. R. Civ. P. 37(a).

Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules. *Wilstein v. San Tropai Condo. Master Assoc*., 189 F.R.D. 371, 375 (N.D. Ill. 1999). Federal Rule of Civil Procedure 26(b)(1) provides that the "[p]arties may obtain discovery regarding any non privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discoverable information is not limited to evidence admissible at trial. Instead, such information is relevant "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Plaintiffs' requests for production included the following demand as Request No. 8:

Produce exact forensic copies (i.e. bit-by-bit copies) of all database files, e-mail or other files maintained on servers or mainframes or microcomputers containing electronically stored information relative to the amount and cost of production info children and infant apparel generated by SPENCER bearing the design "Sorry Boys."

Although Plaintiffs claim in general terms that two of their other discovery requests sought email communications, they fail to specify what those requests were. The Court does not address issues that have not been raised, and it limits its discussion to the sole request cited by Plaintiffs in their motion.

Plaintiffs contend that Defendants responded to Request No. 8 by producing only two email communications that Plaintiffs themselves already possessed. The first, dated March 23, 2009, involves a brief email exchange between Spencer Gifts' associate buyer, Cori Totoro, and Heather Daniels in which Ms. Daniels invited Ms. Totoro to view her merchandise on a website designed for it. The second, dated February 9, 2010, is a response to Heather Daniels' inquiry as to whether Spencer Gifts was interested in carrying her line of clothing. Cori Totoro responded

that she was the company's buyer for children's wear and that Ms. Daniels could send her information about her merchandise. (Dckt. 140 at Ex. D).

Plaintiffs argue that Defendants have failed to produce many other emails allegedly in their possession that are responsive to Plaintiffs' request. As an initial matter, the scope of this demand significantly exceeds what was sought in Request No. 8. Plaintiffs contend at this point that Defendants must turn over all emails "germane to this case." But Request No. 8 did not include such an exceptionally broad and unspecific category of information. It only sought emails concerning "the amount of sales and cost of production" related to the "Sorry Boys" shirts. Only the narrower discovery request stated in Request No. 8 is at issue here.

Plaintiffs rely first on an affidavit of a former employee, Kelsie Bailey, who worked for Spencer Gifts for two months in 2010. Ms. Bailey stated that the store she worked in received emails encouraging stores to promote the "Sorry Boys" shirts and to place them at eye level. Ms. Bailey did not claim that the emails she received contained any information about the shirts' cost or that she sent emails to Spencer Gifts on the number of shirts she sold. (Dckt. 140 at Ex. H). As such, Ms. Bailey's testimony has no relevance to the information sought in Request No. 8 and does not suggest that Defendants have discoverable communications they failed to produce.

Equally unpersuasive is an email between Ms. Daniels and a Spencer Gifts employee named Joyce Wilson, in which Ms. Daniels invited Ms. Wilson to "check out" the website for the "Sorry Boys" shirts. (Dckt. 140 at Ex. G). Plaintiffs contend that this email shows that Defendants must possess other emails that should have been produced. But Ms. Daniels' email merely introduced the shirts to Ms. Wilson and does not contain any information about the costs

of production or the merchandise. Presuming that Defendants even had a copy of this email, they were not required to produce it in response to Request No. 8, and it does not suggest that they have other emails that they failed to turn over.

Next, Plaintiffs point to a written conversation Ms. Daniels had on Facebook. Ms. Daniels sent out a message on that website offering to pay former or current store managers for information on how Spencer Gifts keeps store records. A person named Whitney Mathis responded by stating, in part, that the "[h]ighest selling items are emailed to us from the district." (Dckt. 140 at Ex. J). This response does not provide a basis for concluding that Defendants are concealing other emails on the costs of the "Sorry Boys" shirts. There is no cognizable evidence of who Ms. Mathis is, if or when she worked for Spencer Gifts, or what personal knowledge she has of the "Sorry Boys" shirts – which are never mentioned in her message. Ms. Mathis does not even state that the emails she received contained any information on costs or sales.

Moreover, even if Ms. Mathis' response could be construed to include the shirts, as well as the financial information associated with them, Defendants had no duty to preserve emails that pre-dated the initiation of this suit. When a party first reasonably foresees that litigation is on the horizon, it is required to suspend its ordinary policies governing how information is retained or destroyed and to put into place a litigation hold to preserve relevant material. *Krumwiede v. Brighton Associates, L.L.C.*, No. 05 C 3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006). Plaintiffs have not made any argument that Defendants should have anticipated the filing of this suit before it was initiated on August 24, 2010. Thus, Plaintiffs have failed to demonstrate why Defendants were obligated to preserve emails, or any other documents concerning the "Sorry Boys" shirts, prior to that date.

Plaintiffs note that Defendants admit that they made changes to various purchase orders for the shirts and argue that associated emails must exist for these changes. However, the fact that Defendants may have placed changes to their purchase orders for the "Sorry Boys" shirts is not evidence that they currently possess emails relevant to Plaintiffs' request. As noted above, Defendants placed its orders electronically through SPS and presumably did not rely on written email communications. Plaintiffs point to deposition testimony of SPS's Vice-President of Technology, Ann Knapp, as evidence that such change orders can take place outside of the SPS system. Ms. Knapp did testify that it is "possible" that a purchaser like Spencer Gifts can adjust orders without using the SPS system, but she also stated that she was unable to answer any specific question as to whether Defendants did so. (Dckt. 140 at Ex. L). Plaintiffs appear to assume that Defendants *must* have done so and that, as a result, they have emails related to the cancellation or changes made to certain "Sorry Boys" orders. Clearly, however, the mere possibility that SPS's clients could use some other means for changing orders is not a reason for finding that Defendants did so or that they currently possess emails responsive to Request No. 8. *See Inter-Med, Inc. v. ASI Medical, Inc.*, No. 09-CV-383, 2010 WL 2854288, at *2 (E.D. Wis. July 18, 2010 ("Mere '[s]peculation that there is more will not suffice'") (quoting *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008)).

As a result, Plaintiffs have not shown any ground for finding that Defendants have not turned over all discoverable emails relevant to Plaintiffs' Request No. 8. Plaintiffs' motion to compel is denied.[2]

---

[2] At the January 25, 2012 hearing, Defendants proffered a chart to the Court indicating that it produced additional emails on September 1, 2011 as discovery documents SP002426 to

(continued...)

B.    **The Sanctions Motions**

As noted above, Plaintiffs seek both sanctions and the production of documents.  The

Court attempted to resolve this dispute at the May 23, 2011 hearing by focusing attention on the

database in which Defendants store the information Plaintiffs sought.  Following the hearing, the

Court issued an order on June 14 that stated, in part:

> On or before June 27, 2011, a forensic expert retained by Plaintiffs shall be
> granted access to Spencer Gifts' database and other sources of
> electronically-stored financial and numerical information (including backups) at
> its corporate headquarters in Egg Harbor Township, New Jersey, or such other
> location where such database or information may be kept, to review and copy the
> portions of said database and other sources that contain financial and/or numerical
> information on orders, purchases, receipts, sales, inventory, and costs of SKUs
> 02147551, 02147569, 02147577, 02205854, 02205862, 00205870, 02205888.
> The database and other sources shall be made available to, and can be copied by,
> Plaintiffs' forensic expert in native format; that is, in the file structure defined by
> the original creating application.

(Dckt. 137).  The terms of this order condensed the disparate arguments that had been presented

earlier and constitute the scope of the issues that are currently in dispute.  Although the issues

raised prior to the Court's June 14, 2011 order are important, particularly for the sanctions

portion of Plaintiffs' motions, the primary issues at stake are Defendants' responsiveness to

Plaintiffs' demands under the electronic access granted in the Court's order.  To clarify the wide

---

[2](...continued)
SP002634.  The Court has reviewed the pages referenced in Defendants' chart on a disc provided
by the parties.  Without further explanation, it is unclear what emails documents SP002426 to
SP002634 actually contain.  The pages include tabulations of transaction and store identification
numbers, cashiers' names, and sales prices.  These tabulations begin prior to SP002426 and
extend well beyond SP002634.  Defendants' chart identifies the same pages as part of their May
12, 2011 production concerning inventory and sales information.  This does not change the
Court's analysis of the motion to compel, however, because Plaintiffs have not presented any
argument linking Defendants' supplemental email production to the instant motion.

range of arguments that have been raised in this case, the Court addresses the sanctions portion of Plaintiffs' motions first and then turns to the discovery issues.

### 1. Sanctions

Courts have the power to impose discovery sanctions either pursuant to Fed. R. Civ. P. 37(b)(2), which requires the violation of a court order, or under its own "inherent power to impose sanctions for the abuse of the judicial system, including the failure to preserve or produce documents." *Northington v. H & M Int'l*, No. 08 C 6297, 2011 WL 663055, at *12 (N.D. Ill. Jan. 12, 2011); *see also Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (stating that this power stems from a court's authority to manage its own affairs). The analysis is the same under either standard. *Danis v. USN Communications, Inc*., No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 20, 2000). Sanctions can include the dismissal of a case upon a showing that a party's noncompliant actions have been based on willfulness, bad faith, or fault. *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009) (citation omitted). *See also Phillips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992) (stating that Rule 37 sanctions are "available to penalize balky litigants and to deter others who might otherwise ignore discovery orders").

Plaintiffs have based their numerous sanctions motions on alleged violations of court orders, but they have also included a wide range of ancillary allegations concerning the behavior of Defendants' counsel. These claims range from Plaintiffs' initial contention that Defendants violated Judge Gettleman's September 1, 2010 discovery order, to allegations that Defendants concealed documents, to serious accusations of "obstructionism" (August 1, 2011 hearing) and

"unprofessional conduct" (Dckt. 53 at 2) by Defendants' counsel. These allegations are frequently intertwined in Plaintiffs' briefs, which rely on both the results of the discovery production and counsel's acts to argue that Defendants should be sanctioned. For the sake of clarity, the Court separates these arguments and first addresses claims concerning the behavior of Defendants and their counsel.

After the parties met at Spencer Gifts' headquarters on June 23, 2011 to carry out the forensics ordered by the Court, Plaintiffs filed a status report on the events that had occurred. Their view was clear and to the point: Defendants impeded the forensic exam and prevented their expert Joseph Caruso from even touching the database or from entering his own queries to search Defendants' records. (Dckt. 142). Plaintiffs underscored this point at the August 1 hearing by stating that Defendants had intentionally prevented them from accessing the database, an allegation that essentially claims that Defendants violated the Court's June 14, 2011 order.

The evidence associated with the forensic exam presents a very different picture. Contrary to the implications of Plaintiffs' representations to this Court, Mr. Caruso's forensic report states that he "made the decision to abide by the predetermined method setup by the defendants," not that he was denied a chance to submit his own queries or was otherwise prevented from conducting the exam on his own terms. (Dckt. 142, Ex. 2 at 2). Indeed, Plaintiffs admitted at the August 1 hearing that he did not ask to see any particular data at the exam. Far from being obstructionist, Defendants sent Plaintiffs a letter on July 1, 2011 offering its computers to Mr. Caruso once again in order to access the information he believed was needed. (Dckt. 142 at Ex. D). Plaintiffs declined to accept the invitation, stating that only a properly-conducted exam would suffice. (*Id.*). But the forensic exam ordered by this Court had

- 13 -

already taken place, and Plaintiffs' expert did not submit the queries that Plaintiffs now claimed were necessary. In response, Defendants again issued a return invitation to Plaintiffs at the August 1 hearing, stating in strong terms: "We want this done. And we stand before you today to make the same commitment to this court. Send him back. Do whatever you want to do." (Dckt. 198 at Ex. 3 at 12). Such evidence contradicts Plaintiffs' claim that Defendants impeded the first exam or acted in any manner that was contrary to the Court's directive.

In order to resolve this dispute, the Court allowed the parties to conduct a second forensic exam, and as it had before, the Court emphasized the need for cooperation. To that end, the parties were required to confer with one another during a recess at the August 1 hearing. This meeting was attended by Spencer Gifts' Director of Merchandise Management Systems, Ann Arena, and Plaintiffs' second forensic expert, Alan Ness. The parties later stated in open court that they had reached an agreement on the terms to be used at the second exam. On August 8, 2011, Defendants' counsel memorialized these terms in a letter. The letter set forth data and detailed search terms related to financial and numerical data, Spencer Gifts' SIRIS Management System, as well as vendor, invoice, and advanced shipping tables. (Dckt. 198 at Ex. 4). Plaintiffs subsequently asked Defendants to refine these terms to some degree in order to capture additional information. (Dckt. 156 at Ex. L; Dckt. 201 at Ex. G).

Unhappy with the results of the exam, Plaintiffs filed a second supplemental motion for sanctions on September 21, 2011, alleging that Defendants' behavior again violated the Court's order; Defendants allegedly mistyped one SKU number on purpose to see if Plaintiffs would notice, deliberately filtered data, and were, in general, "obstructionists and concealers." (Dckt. 184 at 13). Plaintiffs filed the motion without first notifying Defendants that they had any

objection to the data produced at the second exam and without complying with the "meet and confer" requirements of Local Rule 37.2. According to Plaintiffs, any attempt along these lines would have been futile.

The Court rejects these characterizations and finds that Defendants' conduct did not violate any court order or involve acts that merit sanctions. Plaintiffs are correct that the "meet and confer" requirement of Local Rule 37.2 does not apply if the meeting would be unproductive. *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 356 (N.D. Ill. 2005). But the evidence supports the opposite conclusion: Defendants' representations in open court, combined with their July 1, 2011 letter inviting Plaintiffs to repeat the first forensic exam, indicate a continuing willingness, even an eagerness, to resolve the issues at hand. Defendants' General Counsel underscored that intent at the hearing by stating: "If Mr. Ness wants to get on a plane and fly to New Jersey and do a personal inspection, I'm happy to do it tomorrow. We want this over[.]" (Dckt. 184 at 16). Plaintiffs were obligated to make some attempt to resolve their differences with Defendants before filing a sanctions motion on the unfounded premise that Defendants were "obstructionists and concealers." Any claim that sanctions are appropriate based on Defendants' alleged recalcitrant and obstructionist behavior is seriously misplaced.

Plaintiffs also claim that sanctions should be imposed because the materials Defendants produced are incomplete, misleading, and are better described as "garbage" instead of proper discovery. (May 23, 2011 hearing). At times, Plaintiffs characterize these acts as spoliation, but the general thrust of their arguments is that Defendants have withheld or altered information, not that they destroyed it. Under Fed. R. Civ. P. 37, a party that fails to disclose evidence "is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is

harmless." Fed. R. Civ. P. 37(c)(1). The Rule also allows a court to dismiss an action or enter default judgment, if a harsh sanction is appropriate. *Id. See also Dotson v. Bravo*, 202 F.R.D. 559, 575 n.103 (N.D. Ill. 2001) ("Falsifying evidence is grounds for the imposition of the sanction of dismissal") (internal quote and citation omitted).

Part of the Court's June 14, 2011 order allowed Plaintiffs to search for information related to SKU 02205888. By all accounts, the query for the number "02205888" was entered by omitting one "8," thereby yielding incomplete results. Plaintiffs contend that Defendants deliberately entered an incorrect SKU number in order to conceal data. (Dckt. 156 at 3). According to Plaintiffs, if "02205888" had been properly typed, the results would have shown that Defendants ordered 21 units of "Sorry Boys" "onesies" as part of that SKU.[3] (Dckt. 156 at 3).

Even assuming this last statement is accurate, it falls far short of the standard required for sanctions. Plaintiffs must show that Defendants acted with the intent to hide evidence. This requires them to explain why Defendants would have actively sought a second forensic exam, correctly entered six of the seven SKU numbers, and then intentionally omitted an "8" in the last number so that they could conceal information. Plaintiffs have presented no argument on this point. A more reasonable explanation is that whoever entered the SKU number made a typographical error that could have been corrected at Plaintiffs' request. In fact, the Defendants offered to do so at the September 26, 2011 hearing and stated that they first learned of the error

---

[3] In their reply, Plaintiffs claim that when the SKU number was corrected, Plaintiffs discovered an additional 1,724 units. (Dckt. 201 at 6). Defendants state that the correction did not result in any changes in Spencer Gifts' purchase orders. (Dckt. 198 at Ex. 9). The parties' dispute over this issue does not change the Court's reasoning.

when they received the sanctions motion. *See* Docket 184 at 16 ("We're happy to do it. We'll do it till the cows come home"). Defendants later corrected the mistake. (Dckt. 201 at 6).

Plaintiffs also claim that Defendants intentionally provided incomplete data at the second exam by placing a stop date of August 2010 to "the forensics." (Dckt. 201 at 2). Plaintiffs do not explain what "the forensics" means in this context, but insofar as it refers to the query terms agreed to in Court and memorialized in Defendants' August 8, 2011 letter (Dckt. 198 at Ex. 10), Plaintiffs fail to state what search terms were violated, or what specific requests they made that were ignored by Defendants. Moreover, Defendants explain that they stopped buying "Sorry Boys" shirts at the end of August 2010, though they continued to sell items as late as April 2011. No evidence supports a finding that Defendants knowingly attempted to disguise data after they stopped purchasing the shirts.

Plaintiffs have long complained that Defendants produced sales data that were intentionally scrambled in an attempt to disguise the true sales and inventory figures for the "Sorry Boys" shirts. (Dckt. 77 at 3). In an earlier sanctions motion, Plaintiffs elaborated on this claim by alleging that none of the SKU entries provided by Defendants were arranged in a discernable pattern and that it "is axiomatic that no business would manage records . . . in this fashion." (Dckt. 53 at 6). However, Spencer Gifts' Merchandise Manager, Gina Bowman, provided a sworn declaration stating in detail how the data at issue was arranged, the reasons for doing so, and why it was not deliberately altered as Plaintiffs claim. (Dckt. 156 at Ex. B). Plaintiffs have provided no reasonable explanation as to why Ms. Bowman's testimony is not credible or why it does not explain the format in which Defendants' initial discovery response was produced. Whether or not Spencer Gifts' means for collecting and storing data constitutes

an unreasonable business practice, there is no evidence that Defendants' explanation of it is not accurate.

Along the same lines, Plaintiffs have also claimed on many occasions that Defendants and their out-of-state counsel lied by telling Plaintiffs that Spencer Gifts does not maintain sales records on a store-by-store basis. Yet, Spencer Gifts' Senior Director of Inventory, Nicholas Campanale, has sworn that the company does not keep "written reports of each and every transaction at each and every Spencer Gifts store." (Dckt. 107 at ¶ 7). Instead of maintaining store-by-store records, Spencer Gifts must generate them by means of specialized search terms. (*Id.* at ¶ 9). Moreover, even assuming that Defendants' original production was "scrambled" as Plaintiffs claim, they admit in their first supplemental motion that "Defendant's [sic] immediately attempted to remedy their intentional errors" when Plaintiffs filed a subsequent motion for sanctions. (Dckt. 77 at 3). This is not how a party acts when it deliberately seeks to hide information from discovery. Thus, no ground exists for finding that Defendants acted with the intent to hide information or that they were unwilling to remedy any defect when the problem was brought to their attention.[4]

---

[4] Insofar as Plaintiffs claim that Defendants destroyed data in violation of Judge Gettleman's September 7, 2010 order to preserve evidence, Plaintiffs have not shown that any spoliation took place. Ms. Bowman testified that Spencer Gifts routinely deletes order and shipment data "from its internal computer inventory system and balances for items that have not been received." (Dckt. 106 at ¶ 8). Plaintiffs have not produced any evidence showing that Defendants deleted any relevant data after this case was filed. Plaintiffs contend that other records must exist because no company would keep records in this manner. The relevant question, however, is not whether Defendants' business plan is reasonable, but whether any evidence provides a ground for rejecting Ms. Bowman's sworn statement. The Court finds that no such evidence has been presented.

Finally, Plaintiffs contend that Defendants lied about their inventory and purchase records because Plaintiffs have discovered that Spencer Gifts uses an undisclosed means for replenishing inventory.  When inventory reaches a pre-determined low point, a purchase order is automatically transmitted to SPS by means of the software program ViaWare, presumably creating purchase orders that are in addition to those produced by Defendants. (Dckt. 77 at 6).  Plaintiffs rely on a mishmash of trade articles and advertisements, including one from the internet site "www.supplychainbrain.com." (Dckt. 77 at Ex. E).  The article is dated July 1, 2005, long before Defendants began purchasing the "Sorry Boys" shirts, and no evidence supports a conclusion that Spencer Gifts even continues to use ViaWare.  Moreover, the article does not state what Plaintiffs claim.  As its name suggests, ViaWare appears to be a warehouse management system that controls the flow of goods between individual stores and Spencer Gifts' warehouse, not direct orders from individual stores to SPS.  Plaintiffs buttress their argument with additional website pages concerning other software programs allegedly used by Spencer Gifts.  But even assuming Spencer Gifts used any of the programs cited in these pages when it ordered and sold the "Sorry Boys" shirts, none of Plaintiffs' publications mention SPS.  Thus, the claim that Spencer Gifts uses ViaWare or the other programs to place orders with SPS is based on unwarranted speculation instead of evidence.

Defendants admit that their discovery responses have not always been fully accurate. Information for one of the SKUs was omitted in Defendants' first production, and data entry errors also took place. (Dckt. 105 at 2-3).  Standing alone, however, mistakes are not a ground for sanctions under Rule 37 unless the offending party has wilfully violated a court order or behaved in a manner that requires a court to exercise its inherent power.  Based on the parties'

briefs and the many discussions that have taken place in open court, the Court finds that no evidence supports a conclusion that Defendants have violated a court order, wilfully obstructed discovery, or altered, withheld, or destroyed relevant evidence. Plaintiffs' supplemental motion for sanctions (Dckt. 77) and second supplemental motion for sanctions (Dckt. 156) are denied to the extent that they seek to impose sanctions on Defendants.

### 2.       Discovery

Plaintiffs' second supplemental sanctions motion, together with the terms agreed to by the parties as part of the August 1, 2011 hearing, leave three broad categories of information at issue in this discovery dispute: (1) inventory and purchase data, (2) data related to Defendants' use of PeopleSoft, and (3) miscellaneous items such as emails, internet sales, and FedEx records. Many of the arguments presented, especially in the first category, have relied on claims that specific numbers of "Sorry Boys" shirts either were, or were not, ordered and received. As the Court noted on several occasions, however, the determination of such issues involving the merits of Plaintiffs' claims is reserved to the finder of fact at trial, and the Court considers them only insofar as it is necessary to assess the pending motions. The only salient issue in those motions is whether Defendants have produced the discoverable evidence it possesses that is responsive to Plaintiffs' requests. Accordingly, the Court makes no finding of fact concerning the number of shirts that Defendants actually ordered or received.

a.    Inventory and Purchase Data

Spencer Gifts manages its inventory transactions and merchandise data by means of its in-house SIRIS system. A letter from Defendants on August 8, 2011 memorialized the parties' agreements concerning the queries, or SQLs, that would be submitted to Defendants' database concerning the SIRIS issues.[5] These included SQLs on various "tables" maintained in the database, including those for purchase orders, SKUs, receiving records, advance shipping notices, FedEx data, and invoice tables. (Dckt. 198 at Ex. 10). Plaintiffs responded to Defendants' letter on August 10 by requesting, in relevant part, one additional SQL table. On or around August 17, Defendants produced the results of the SIRIS queries. This included purchase order information involving 550,000 rows of data on twelve Excel spreadsheets, data for receivables consisting of 517,000 rows, and 490,000 rows of invoice information. (Dckt. 198, Ex. 4 at 3). Plaintiffs claim this is insufficient.

Much of Plaintiffs' argument on the inventory issue is based on Mr. Ness's September 9, 2011 declaration, which claimed that the produced SIRIS data had several defects.[6] These included an incomplete vendor list and "unexplained gaps" in the SIRIS material.[7] Ness also

---

[5] A SQL, or structured query language, is a declarative language used to manage data in relational database management systems. Such queries convert the "0"s and "1"s of electronically stored information into a decipherable format.

[6] The Court notes with some concern that Ness was later required to withdraw a part of his declaration, which stated that Defendants ordered more merchandise than they disclosed. (Dckt. 198, Ex. 22 at ¶ 6). At his deposition, he conceded that the basis for this conclusion was the fact that one purchase order had been entered twice. (Dckt. 201, Ex. A at 211).

[7] Plaintiffs claim in other portions of their motions that Defendants have not provided data related to all their vendors, including the offshore "vendor sub" 12958, which allegedly involves a Latin American vendor. Defendants have consistently stated that Tee Shirt Central was the only vendor that sold the "Sorry Boys" shirts to them, and that Plaintiffs' request

(continued...)

stated in broad terms that Defendants had improperly placed filters on their queries that intentionally concealed certain data.[8] (Dckt. 156 at Ex. M). Several countervailing facts undermine the force of these statements. For one, Defendants pointed out at the January 25, 2012 hearing that Plaintiffs not only already have their inventory statement, they attached it as an exhibit to their reply brief. (Dckt. 201 at Ex. P). The form purports to be a "Perpetual Inventory Transaction Summary" for the relevant SKUs from November 1, 2009 to April 21, 2011. Plaintiffs' reply brief fails to show why this document is inaccurate or insufficient.

Moreover, Ness's declaration does not specify what the alleged "gaps" in Defendants' production encompass. In their second supplemental motion, Plaintiffs also fail to explain what the gaps involve, claiming instead that they show a conflict between the SIRIS and PeopleSoft transaction data. Plaintiffs refer the Court, without further explanation, to the data analysis that was attached as an exhibit to Ness's declaration. By contrast, Defendants address the issue directly. They make clear that the imbalance Ness noted between SIRIS and PeopleSoft stems

---

[7](...continued)
improperly seeks data concerning all of Spencer Gifts' non-"Sorry Boys" merchandise. Moreover, Defendants argue that the spreadsheets produced to Plaintiffs show that no orders were ever placed with vendor sub 12958. Plaintiffs have not produced any evidence or argument showing why they are entitled to such broad information. Their discovery demands for this data are denied.

[8] In addition, Ness stated that bit-by-bit mirror images of the computers of Cori Totoro and Rosanne Segers were not produced. Plaintiffs' second supplemental sanctions motion seeks the production of these images. Although the Court's July 14, 2011 order included both Spencer Gifts' database and "other sources of electronically-stored financial and numerical information (including backups)," this language did not expressly contemplate the personal computers of individual employees. Plaintiffs may be entitled to explore such electronic sources upon a showing of need, but their motion merely states that Defendants did not produce images of Totoro's and Segers' computers. This presents no argument on why such production is necessary or what information would be produced that is not available on Spencer Gifts' own database. Plaintiffs' discovery request on this issue is denied.

from the fact that, as discussed more fully below, the PeopleSoft data were kept only from May 2010 through August 2010, whereas the relevant SIRIS data extend from November 2009 through August 2010. (Dckt. 198 at 9). Plaintiffs' reply brief does not address Defendants' account of the alleged gaps, thereby failing to show that any discrepancy actually exists between the SIRIS and PeopleSoft data.

In his declaration, Ness claimed that the gaps and other errors in Defendants' production stemmed from their failure to comply with the terms agreed to at the August 1, 2010 hearing. (Dckt. 156, Ex. M at ¶¶ 12-13). Plaintiffs expand on this claim by stating in their reply brief that Defendants failed to run one of the receiving record tables for SIRIS, three of which were specified in the August 8, 2010 letter memorializing the parties' SQL agreement. However, Plaintiffs do not cite any evidence to support this claim. Ness did not state that in his declaration, and Plaintiffs fail to point to any testimony to that effect in his deposition. The Court notes that Ness admitted that he obtained receiving record procurement data as a result of the second exam. (Dckt. 201, Ex. A at 105-110, 222-23). If this was insufficient, Plaintiffs must specify the error they believe is involved. As it stands, however, Plaintiffs have not shown which, if any, of the three receiving record tables agreed to was not queried at the second exam.

Instead, Plaintiffs point to an assortment of letters and emails, one of which is dated July 18, 2010 and contains detailed SQL requests from Ness to Defendants. (Dckt. 201 at 3). Clearly, these elaborate requests pre-date the terms agreed to at the August 1 hearing. The very purpose of the second exam was to rectify alleged errors in the first exam in order to bring this dispute to an end. The parties expended considerable time and effort in agreeing on SQLs at the August 1 hearing and in undertaking the second forensic exam. If Plaintiffs believed their

July 18 SQLs were crucial and were not encompassed by the terms set forth in Defendants' August 8 letter, they should have stated that fact in their August 10 response or at some other time before the second exam was conducted. Doing so at this point is futile. Thus, insofar as Plaintiffs contend that Defendants should have run different queries, or that they should be required to undergo yet a third forensic exam, the time for seeking electronic information from Defendants' database has come and gone. In fact, it has done so twice.

As for the filters referred to in Ness's declaration, it is again unclear what specific component of the queries is at issue. Plaintiffs have argued in several hearings that Defendants did not produce responsive data after August 2010. Plaintiffs' generalized complaint of unwarranted filters fails to show why Defendants possess relevant post-August 2010 data. Ms. Arena testified that Spencer Gifts stopped buying the "Sorry Boys" shirts from Tee Shirt Central at that time and that no purchase records exist from September 2010 forwards. (Dckt. 198 at Ex. 4). Ness admitted in his deposition that he did not mention the filters in his supplemental report and that if the SQLs were to be changed, he could not say that the results would be significantly different. *See* Dckt. 201, Ex. A at 69 ("I don't know if that materially affected the results . . . But I know that there are filters that *possibly* constrain the results") (emphasis added). This fails to show why additional discovery is required. If the Court were to order a further electronic search based on these allegations of filtered data, it would have no clear idea of what new information was being sought or what specific changes to the second set of SQLs would justify a third forensic exam.

Equally important, the basis for much of Plaintiffs' arguments supporting their request for further discovery on this issue is not well founded. Plaintiffs argue that Defendants are actively

concealing information about the number of shirts they ordered and sold and recently raised the

alleged number of ordered shirts from 95,500 to 101,244 units. This number is based on an

arithmetic calculation by CPA Charles Nelson, who appears to have added up numbers on

documents provided to him with pre-circled figures.[9] (Dckt. 198 at Ex. 21). Defendants have

rebutted Plaintiffs' claims by submitting declarations of representatives of each of the three

entities involved in the relevant transactions – Spencer Gifts (which bought the shirts), SPS

(which recorded the orders and sent them to Tee Shirt Central), and Tee Shirt Central (which

shipped the shirts to Spencer Gifts). SPS states that it received orders for 24,865 shirts. Tee

Shirt Central states that it shipped Spencer Gifts 24,883 shirts. Spencer Gifts states that it

received 24,860 shirts. (Dckt. 198 at Exs. 12 - 14). The exact number of shirts ordered is outside

the scope of this proceeding, but Plaintiffs have not provided any evidence to counter these

sworn statements and have not shown why Defendants have undisclosed documents that are

relevant to the issue at hand.[10]

 After carefully examining the entire record, the Court believes that the evidence strongly

suggests that the real dispute between the parties concerns the proper method for interpreting

what has already been produced. Many of Plaintiffs' arguments are based on inferences derived

---

[9] Defendants later filed a motion to strike Nelson's affidavit. (Dckt. 179). The Court denied it on the ground that all relevant evidence should be considered. Having done so, the Court finds that based on the arguments set forth in Defendants' motion, Nelson's affidavit has little or no probative value to this dispute.

[10] At the hearings, Defendants explained the discrepancy of 23 shirts between what Tee Shirt Central claims was shipped and the number actually received as natural "slippage" in the packaging and unpackaging of the shirts. Gina Bowman, Spencer Gifts' merchandise manager, also testified that "[i]t is not uncommon for suppliers to ship less than the ordered number of a certain item, or even fail to ship any quantity of an ordered item at all." (Dckt. 156 at Ex. B).

from their understanding of the available evidence. A specific example illustrates this point. Plaintiffs earlier claimed that Purchase Order 554966 proves that Spencer Gifts lied about the number of shirts in its inventory. (Dckt. 54 at 10). According to Plaintiffs, the purchase order shows that Spencer Gifts ordered at least 221 shirts, but the corresponding purchase order information from SPS allegedly shows that Spencer Gifts actually received 444 shirts as part of order 554966. In response, Defendants point out that SPS's Rule 30(b)(6) witness testified that SPS's data do not provide information as to what was shipped, thereby undermining an essential part of Plaintiffs' claim. (Dckt. 198 at Ex. 16). They also state that Plaintiffs failed to distinguish between purchase orders and cancellation orders and that they aggregated the numbers in some of these different types of orders. In support, Defendants have provided an exceptionally detailed analysis of the entire history of purchase order 554966. This account attempts to demonstrate that Defendants made at least eight subsequent changes to the original order and eventually *cancelled* it entirely. In addition, Defendants have also carefully described what they believe to be the proper method of analyzing all their inventory and accounting data.

While the Court does not find that Defendants' interpretation of their purchase records is correct, Plaintiffs have not provided any meaningful response to it or explained why further discovery would reveal additional relevant data. At a minimum, Plaintiffs must present some argument as to why Defendants' understanding of their own records is incorrect and explain why some other means of making sense of the data indicates that further discovery is required. In the absence of such an explanation, Plaintiffs' motions are denied on this issue.

        b.      <u>PeopleSoft</u>

Spencer Gifts uses the financial accounting program, PeopleSoft, to record accounts payable and receivable for all of its merchandise, including the "Sorry Boys" shirts. (Dckt. 198 at Ex. 4). Plaintiffs argue that the PeopleSoft material produced as a result of the two forensic exams is insufficient. In support, they cite Mr. Ness's generalized conclusion that Defendants did not provide all of the PeopleSoft data that Plaintiffs requested. (Dckt. 156 at Ex. M). As before, however, Ness's declaration does not state what specific material is missing. Plaintiffs' second supplemental motion is no more helpful, stating only that there are unexplained gaps and data that do not match. (Dckt. 156 at 3).

As with the SIRIS issue, these claims fail to account for Defendants' explanation of their accounting records. Ms. Arena testified that Defendants ran a query on the PeopleSoft database to extract payment information for the relevant SKUs. The data that resulted from this search only extended from May 18, 2010 to the point Defendants stopped buying the "Sorry Boys" shirts in August 2010 because Spencer Gifts did not use PeopleSoft for purchase orders before May 18, 2010. (Dckt. 198, Ex. 4 at 4-5). Moreover, Spencer Gifts does not keep revenue information in PeopleSoft on a SKU-by-SKU basis. The Court notes that Mr. Ness acknowledged in his deposition that not all companies that use PeopleSoft keep such records on that basis. (Dckt. 201, Ex. A at 122).

Instead of using PeopleSoft, Spencer Gifts keeps revenue data on a SKU-by-SKU basis in its Auditworks system. Plaintiffs claim in their second supplemental motion that Defendants failed to provide their complete Auditworks data. Plaintiffs provide almost no argument in their brief as to why the Auditworks production is incomplete, however, and overlook that issue entirely in their last reply. The Court cannot address arguments that have not been presented.

- 27 -

The record shows that Defendants produced their Auditwork documents to Plaintiffs on two different occasions.

Plaintiffs appear to support their argument by relying on an affidavit of a former Spencer Gifts store manager, Angelia Merza, to claim that Defendants had a "'back office' auditing system" prior to 2007 that tracked changes on a SKU-by-SKU basis. It is not entirely clear what this claim has to do with PeopleSoft or Auditworks, but Plaintiffs' reliance on Ms. Merza's affidavit to show the existence of a "'back office' auditing system" for invoices is misplaced. Ms. Merza stopped working for Spencer Gifts in May 2007, and she does not mention PeopleSoft or any other "auditing system." Plaintiffs claim that Merza shows that Spencer Gifts could track "changes via invoice in 2007 with SKU by SKU detail." (*Id*. at 8). This is not entirely accurate. She stated that in 2007 she could "access historical data" and "drop ship invoices" on this basis, but she made no mention of an auditing system and gave no testimony concerning how Spencer Gifts' database maintained the company's revenue. Ms. Merza did not claim to have knowledge about Spencer Gifts' company-wide procedure for keeping records, and her testimony falls short of being evidence that Spencer Gifts has withheld discoverable evidence from Plaintiffs. Plaintiffs' motions are denied on this issue.

c.    FedEx, Emails, and Internet Data

Plaintiffs also asked Defendants to produce all FedEx records in their possession that relate to the "Sorry Boys" shirts. Although this category does not necessarily fall within the "financial and numerical information" specified in the Court's June 14, 2011 order, Defendants did so. This production did not include all the information sought by Plaintiffs because

Defendants do not keep such records for more than one year in the ordinary course of business. Plaintiffs contended at the last hearing that the FedEx records will show what Spencer Gifts shipped despite the fact that FedEx shipping slips do not state the contents of the package being sent. According to Plaintiffs, the shipping slips also contain an invoice number that can be cross-checked with other data to reveal shipments, order changes, or cancellations.

This argument fails to show that further discovery is necessary on this issue. Defendants have already produced their purchase order changes, and Plaintiffs provide no reason to assume that cross-referencing FedEx records would reveal any information that has not already been disclosed. Plaintiffs' second supplemental motion is based on a claim that Defendants can easily contact FedEx to obtain the records, but that argument is equally applicable to Plaintiffs themselves. As Defendants have represented that they have turned over all the FedEx records they have, Plaintiffs' motions are denied on this issue.

Plaintiffs contend that Defendants have also withheld data concerning sales of the "Sorry Boys" shirts through Spencer Gifts' website. In support, Plaintiffs point to a receipt for a December 4, 2010 internet sale. The receipt identifies the product as SKU 02205854. Plaintiffs claim that the document that Defendants produced showing internet transactions does not cross-reference a sale on that date for SKU 02205854. (Dckt. 77 at 7). In response, Defendants contend that Plaintiffs have once again misunderstood the nature of Defendants' records. Spencer Gifts' senior inventory director, Nicholas Campanale, testified that all internet orders for "Sorry Boys" shirts are assigned SKU 02205584 as a default number no matter what product is actually ordered. Only when the shirt is shipped does the order reflect the item's true SKU.

- 29 -

Mr. Campanale attached an exhibit to his declaration showing that Defendants had accounted for the internet order relied on by Plaintiffs. (Dckt. 156 at Ex. H).

Plaintiffs also rely on Mr. Ness's testimony that the produced documents show that less than 1% of Spencer Gifts' sales were made through the internet and that such a low figure was "surprising." (Dckt. 201, Ex. A 116). Defendants explained at the last hearing that the 1% figure represented the totality of internet sales because Spencer Gifts is primarily a store-based company. This may be a lower figure than would be the case for other companies, but no evidence suggests that Defendants have misrepresented the nature of Spencer Gifts' business model or that additional documents concerning internet sales exist. Plaintiffs' motions are denied on this point.

Finally, Plaintiffs re-assert an expanded version of their arguments concerning unproduced emails related to the "Sorry Boys" shirts. This claim goes beyond the narrower scope of the motion to compel discussed above to include "all relevant emails." (Dckt. 156 at 4). Plaintiffs claim in general terms that it belies logic to believe that no additional emails exist. (Dckt. 201 at 10). Instead of evidence, however, Plaintiffs point to Ness's deposition testimony that Defendants chose to "cut off the end date" of the emails that were produced. (*Id.*, Ex. A at 179). As Defendants have repeatedly explained, however, they stopped buying the "Sorry Boys" shirts at the end of August 2010 and did not preserve pre-lawsuit emails. Defendants had no duty to preserve emails before the time this suit was filed, which coincides with the cessation of "Sorry Boys" purchases. This fact, combined with Defendants' representation that they have searched all their databases for emails that are responsive to Plaintiffs' request for emails,

persuades the Court that no evidence supports Plaintiffs' claim that Defendants are withholding emails. Plaintiffs' motions are denied on this issue.

### III. Conclusion

For all these reasons, the Court finds that Plaintiffs have not shown any ground for ordering Defendants to conduct an additional forensic exam of their database or that Plaintiffs should be allowed to search any other electronically-stored financial and numerical information possessed by Defendants. Plaintiffs have not demonstrated a reason for concluding that Defendants withheld discoverable evidence, obstructed the discovery process, or violated a court order. As Defendants have represented that they have produced all the relevant evidence in their possession, they will not be allowed to use any document that has not already been produced in any subsequent proceeding in this case, absent a further order on this issue. Accordingly, Plaintiffs' motion to compel [Dckt. 140], first supplemental motion for sanctions [Dckt. 77], and second supplemental motion for sanctions [Dckt. 156] are denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

Dated: February 14, 2012.                          United States Magistrate Judge

- 31 -